UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **FAIR HOUSING CENTER OF CENTRAL INDIANA, INC.** and **BRENDA STROUT,** | Case No. 20-cv-372 |
| Plaintiffs, | |
| v. | |
| **HARTFORD PLACE, L.P.** and **CROWNPOINTE COMMUNITIES, LLC,** | |
| Defendants. | |

## COMPLAINT

### I. INTRODUCTION

1.  Plaintiffs – a former resident and fair housing center – seek monetary, declaratory, and injunctive relief against the owners and managers of the Hartford Place Apartments, an affordable housing complex for older persons in Hartford City, Indiana, for discrimination on the basis of disability in violation of the federal Fair Housing Act and related state laws.

### II. JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that the claims alleged herein arise under the laws of the United States. This Court

has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine plaintiffs' state law claims because those claims are related to plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to plaintiffs' federal claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper under 28 U.S.C. § 1391 and Local Rule 3-1 because the events alleged in this complaint occurred in Blackford County, Indiana.

### III. PARTIES

4. Plaintiff Fair Housing Center of Central Indiana, Inc. ("Fair Housing Center") is a private, nonprofit Indiana corporation working to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education, and outreach. It is the only private, nonprofit fair housing agency in the State of Indiana. Its offices are located in Indianapolis. Since 2019, the Fair Housing Center has diverted significant staff time and resources to investigate Hartford Place Apartments in response to the concerns of persons injured by defendants' discriminatory and unlawful practices.

5. Plaintiff Brenda Strout, 73, resided at Hartford Place Apartments, a dwelling under the Fair Housing Act, 42 U.S.C. § 3602(b), between April 2019 and May 2020. Strout suffers from chronic kidney disease, asthma, COPD, and was diagnosed with cancer in 2019. She uses a wheelchair for mobility. She is substantially impaired in her ability to walk and engage in other major life activities

and qualifies as a person with a disability or handicap within the meaning of the federal Fair Housing Act, 42 U.S.C. § 3602(h).

6. Defendant Hartford Place, L.P., an Indiana limited partnership, owns the Hartford Place Senior Apartments. CPV Hartford Place, Inc., an Indiana corporation, is the general partner of Hartford Place, L.P. Both Hartford Place, L.P. and CPV Hartford Place, Inc. maintain their principal places of business at 1836 South Patriot Drive in Yorktown, Indiana.

7. Defendant CrownPointe Communities, LLC, an Indiana limited liability company, manages the Hartford Place Senior Apartments. Its principal place of business is located at 1836 South Patriot Drive in Yorktown. CrownPointe Communities, LLC owns and operates Crownpointe of Hartford City and at least six other assisted living/residential care facilities and campuses in Indiana and Michigan.

8. Each defendant is the principal, agent, partner, co-venturer, or co-conspirator of each other defendant. Each defendant is vicariously liable for the injuries caused by each other defendant.

## IV.  FACTS

### A.  The Hartford Place Senior Apartments

9. The Hartford Place Senior Apartments ("Hartford Place Apartments") is a 34-unit apartment complex located at 102 Independence Parkway in Hartford City, Indiana. The Hartford Place Apartments was developed as new construction in the mid-2000s, funded in part through tax credits under the Low Income Housing Tax Credit (LIHTC) program allocated through the Indiana Housing Finance Authority.

The project also received funding through HUD's HOME affordable housing program administered through the Indiana Housing Finance Authority.

10. Created by the 1986 Tax Reform Act and administered by the United States Department of the Treasury, the LIHTC program is the largest federal subsidy program for affordable housing construction and rehabilitation. The Internal Revenue Service allocates tax credits to the states which they in turn allocate to individual housing projects. The Indiana Housing Finance Authority allocated tax credits to the owner and developer of the Hartford Place Senior Apartments in exchange for their commitment to provide low-income housing for qualified seniors and to abide by the rules of the LIHTC program, including the non-discrimination requirements of the Fair Housing Act. 26 C.F.R. § 1.42-9(a). Under the federal regulations governing the LIHTC program, the owner of a low-income housing project must make annual certifications to the state housing credit agency that the project is in compliance with the LIHTC program requirements, including certification that no finding of discrimination under the Fair Housing Act with respect to the property has occurred. 26 C.F.R. § 1.42-5(c)(1)(v). The state agency is obligated to notify the Internal Revenue Service of any noncompliance of which the agency becomes aware. 26 C.F.R. § 1.42-5(a)(1). HOME-funded dwellings are subject to similar restrictions and regulations.

11. The Hartford Place Apartments are part of a senior campus known as CrownPointe of Hartford City. The campus is a mix of units providing residential

care and unlicensed affordable housing for seniors. According to the CrownPointe Communities website:

> CrownPointe of Hartford City, Indiana opened in 2000. It offers luxury assisted living with state-of-the-art features incorporating all the creature comforts of home. This one-story building offers the utmost in convenience. Our floor plans ensure a brief walk to the restaurant style dining room, activity room or your new neighbor's apartment for an impromptu visit.
>
> This assisted living community has it all. It takes a *village* to care for our seniors. This is your village. The campus includes a senior condominium community with 20 luxury condos. A new hospital and medical offices provide state-of-the-art medical services for residents. A new church has been constructed on the campus, as well as 32 affordable housing apartments for seniors.
>
> Nestled away from the hustle and bustle of the street, one can enjoy the refreshing sounds of country living from your private patio, restaurant style dining, scheduled transportation and personal attention to your needs. This property offers the assistance when you desire a little extra help and the enjoyment of independence.

(https://crownpointecommunities.com/facilities/crownpointe-hartford-city/.)

12. The Hartford Place Apartments – unlicensed dwellings – consists of four, free-standing, single-story buildings and an office/clubhouse building. There are 34 total apartment units, consisting of 18 one-bedroom and 16 two-bedroom units. Six of the 34 units are handicapped accessible.

13. The Hartford Place Apartments are affordable housing for income-qualified, older persons. They are rental dwellings providing no residential care or licensed services. Nonetheless, the rules and regulations at the Hartford Place Apartments provide:

> This property is Independent Living. When a Resident is no longer able to live independently, the family of the Resident must report their condition to the Manager. When a Resident is admitted to the Hospital or Nursing Home the family must report this change to the Manager.

**B.    Brenda Strout Rents an Apartment at the Hartford Place Apartments**

14.    In March 2019, Brenda Strout submitted an application to move into an affordable unit at Hartford Place Apartments. The application packet Hartford Place provided to Strout described Hartford Place as an "Independent Living Community, a part of the Crown Pointe Communities Campus, for individuals age 55 and over." April Bower, Strout's daughter, also applied for residence. Their applications were approved in April 2019. Strout moved into apartment 11; Bower moved into an apartment across the way.

15.    Bower provides Strout with the support she needs to maintain her independence. Bower helps her mother with her medication, keeps track of her appointments, and provides Strout with transportation to doctor's visits and shopping.

**C.    Defendants' Mandatory Relocation Policy**

16.    In early August 2019, Strout, Bower, and other residents of Hartford Place received a new form attached to their rent receipts entitled "Mandatory Relocation." The form came with a handwritten note, "Please sign and return," and included a second page entitled "Mandatory Relocation Acknowledgment Form."

17.    The Mandatory Relocation form, distributed in August 2019, stated Hartford Place's occupancy policy:

> POLICY: Hartford Place Apartments is an affordable rental housing community for independent older adults.
>
> In order to maintain Hartford Place, the residents must be able to live independently. Any assistance with activities of daily living must be limited in scope and duration. The interpretation of this policy rests exclusively with the Management of Hartford Place. If the physical/mental status [of a resident] does not meet these criteria, relocation may be initiated.

18.   It also published a list of nine "criteria" for assessing whether a resident met Hartford Place Apartment's independent living policy, including:

> •   Residents of Hartford Place Apartments must be ambulatory (with or without an assistive device, i.e., walker, cane, wheelchair.)
>
> •   The individual must be able to perform activities of daily living (i.e., bathing dressing, grooming, eating, etc.), receiving only minimal and occasional direction or assistance from a caregiver ....
>
> •   Each resident may be assessed, at the resident's expense, if needed to ensure that the resident's physical/mental condition continues to meet the criteria for independent living.
>
> •   If the resident's needs are such that they are unable to be appropriately met by intermittent outside services, relocation to an appropriate setting will be addressed with the resident and family members.

19.   The Mandatory Relocation form threatened to evict residents who failed to meet defendants' criteria for independent living:

> If the resident and/or responsible party refuses to relocate, or cooperate with providing Management with proper documentation from a physician that the resident is safely able to reside independently in the apartment, the facility may initiate eviction procedures as described in the lease.

20.   By its terms, the application, interpretation, and enforcement of the Mandatory Relocation policy "rest exclusively with the Management of Hartford

Place. If the physical/mental status does not meet these criteria, relocation may be initiated."

21. The Mandatory Relocation form came with a "Mandatory Relocation Acknowledgment Form." That form provided a space for residents or family members to sign, affirming that they –

> understand that should the condition of a resident of Hartford Place Apartments deteriorate and the care needs of the resident be unable to be appropriately met by outside services or if the cognitive ability of the resident declines, causing a significant lack of safety awareness, relocation to an appropriate healthcare setting will be addressed with the resident and family members and that assistance will be provided in finding an appropriate alternate setting.

22. Strout reviewed the Mandatory Relocation form carefully and it frightened her. She worried that she might not meet each of the criteria listed in the policy to avoid eviction and feared that – even if she did meet the criteria – the policy gave exclusive discretion to Hartford Place's owners and managers to force her from her home based on her disability. If forced from her apartment, Strout worried she would have no place to go.

23. Strout refused to sign and return the Mandatory Relocation Acknowledgment Form. But she continued to fear that defendants could evict her from her home based on her disability. She worried that even if she met the policy's criteria today, she might fail to meet that criteria to defendants' satisfaction in the future.

24. Strout's fears came rushing back in April 2020. On April 2, 2020, Hartford Place's manager distributed the annual LIHTC recertification packets for

execution by tenants to certify that they continued to be eligible for their subsidized units at Hartford Place. Along with the standard LIHTC recertification forms, the packet included the "Mandatory Relocation" policy and the "Mandatory Relocation Acknowledgment Form." The inclusion of the Mandatory Relocation policy in the recertification packet compounded Strout's fears. She became afraid that signing the Mandatory Relocation was a requirement for her annual recertification and that she might lose her housing if she refused to sign.

25. Strout decided that her best option was to move out of Hartford Place. She and her daughter April Bower vacated their units at Hartford Place at the end of May 2020.

### D. The Fair Housing Center Investigates Discrimination at Hartford Place Apartments

26. On August 14, 2019, the Fair Housing Center of Central Indiana received two separate communications from employees of LifeStream Services regarding the Mandatory Relocation it had received from a client living at the Hartford Place Apartments. LifeStream is the non-profit Aging and Disability Resource Center serving East Central Indiana, including Blackford County. LifeStream provides services and programs to help seniors and people with disabilities remain independent. Both persons contacting the Fair Housing Center expressed concern that the Mandatory Relocation policy distributed by the Hartford Place Apartments discriminated against persons with disabilities. In response to those communications, the Fair Housing Center opened an investigation.

27. The following week, the Fair Housing Center received a call from Brenda Strout who expressed her concerns regarding the Mandatory Relocation policy she had received from Hartford Place's management. The Fair Housing Center counseled Strout regarding her fair housing rights.

28. On September 13, 2019, the Fair Housing Center sent a letter to all residents of Hartford Place Apartments, providing them with fair housing information. The letter advised residents that the Fair Housing Center was conducting an investigation into management practices at the Hartford Place Apartments and asked them to assist by calling the Fair Housing Center to complete a short phone survey. The Fair Housing Center received responses from a number of residents, approximately half of whom indicated that they had received the Mandatory Relocation notice.

### E. Plaintiffs' Injuries

29. As a result of defendants' unlawful acts and practices, Strout suffered loss of the value, use and enjoyment of her property, deprivation of important housing opportunities, and emotional distress, including humiliation, embarrassment, disappointment, frustration and attendant bodily injuries.

30. Defendants' unlawful and discriminatory conduct also injured plaintiff Fair Housing Center, causing it to divert its scarce resources and frustrating its mission. To counteract defendants' discriminatory housing practices, the Fair Housing Center diverted staff time from other projects in order to investigate defendants. Its staff conducted a survey of Hartford Place Apartments, interviewed

witnesses, collected and analyzed public records, and counseled victims injured by defendants' discriminatory practices.

31. Defendants committed each of the unlawful and discriminatory practices alleged in this complaint with reckless disregard of the rights of plaintiff Brenda Strout.

### F. Prefiling Attempt to Resolve this Action

32. On April 23, 2020, counsel for plaintiffs sent a prefiling demand letter to defendants inquiring whether CrownPointe and Hartford Place were interested in discussing a resolution of this matter. An attorney for defendants acknowledged receipt of that letter, but defendants never engaged in any substantive communication after that initial acknowledgment.

## V. CLAIMS

### A. First Claim: Disparate Treatment In Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(1)

33. Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

34. Each defendant, directly and acting through its agents, injured Strout and the Fair Housing Center pursuant to a pattern or practice of disparate treatment, including commission of the following discriminatory housing practices in violation of 42 U.S.C. § 3604(f)(1):

    a. Discouraging any person from renting a dwelling because of disability, 24 C.F.R. § 100.70(b)(1);

    b.    Communicating to any renter that he or she would not be compatible with existing residents of a development because disability, 24 C.F.R. § 100.70(b)(3);

    c.    Assigning any person to a particular section of a community or development, because of disability, 24 C.F.R. § 100.70(b)(4).

35.    Each of these violations of § 3604(f)(1) injured plaintiffs; accordingly, each is an aggrieved person entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(c).

**B.    Second Claim: Disparate Treatment In Violation of the Fair Housing Act, 42 U.S.C. § 3604(f)(2)**

36.    Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

37.    Each defendant, directly and acting through its agents, injured Strout and the Fair Housing Center pursuant to a pattern or practice of disparate treatment, including commission of the following discriminatory housing practices in violation of 42 U.S.C. § 3604(f)(2):

    a.    Using different provisions in leases, such as those relating the terms of a lease, because of disability, 24 C.F.R. § 100.65(b)(1); and,

    b.    Making an inquiry to determine whether an resident of a dwelling has a disability or to make inquiry as to the nature or severity of a disability of such person, 24 C.F.R. § 100.202(c).

38. Each of these violations of § 3604(f)(2) injured plaintiffs; accordingly, each is an aggrieved person entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(c).

**C. Third Claim: Discriminatory Statements In Violation of the Fair Housing Act, 42 U.S.C. § 3604(c)**

39. Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

40. Each defendant, directly and acting through its agents, injured Strout and the Fair Housing Center pursuant to a pattern or practice of discriminatory statement, including commission of the following discriminatory housing practices in violation of 42 U.S.C. § 3604(c):

   a. Using words, phrases, photographs, illustrations, symbols or forms which convey that dwellings are available or not available to a particular group of persons because of disability, 24 C.F.R. § 100.75(c)(1); and,

   b. Expressing to agents, brokers, employees, or renters or any other persons a preference for or limitation on any renter because of the disability of such persons, 24 C.F.R. § 100.75(c)(2).

41. Each of these violations of § 3604(c) injured plaintiffs; accordingly, each is an aggrieved person entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(c).

//

### D.   Fourth Claim:  Disparate Treatment In Violation of the Fair Housing Act, 42 U.S.C. § 3604(d)

42.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

43.   Each defendant, directly and acting through its agents, injured Strout and the Fair Housing Center pursuant to a pattern or practice of disparate treatment, including commission of the following discriminatory housing practices in violation of 42 U.S.C. § 3604(d):

   a.   Representing that lease provisions which purport to restrict the rental of dwellings because of disability preclude the rental of a dwelling to a person, 24 C.F.R. § 100.80(b)(2); and,

   b.   Enforcing lease provisions which preclude the rental of a dwelling to any person because of disability, 24 C.F.R. § 100.80(b)(2).

44.   Each of these violations of § 3604(d) injured plaintiffs; accordingly, each is an aggrieved person entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(c).

### E.   Fifth Claim:  Interference In Violation of the Fair Housing Act, 42 U.S.C. § 3617

45.   Plaintiffs reallege and incorporate by reference all preceding paragraphs alleged herein.

46.   Each defendant, directly and acting through its agents, injured Strout and the Fair Housing Center pursuant to a pattern or practice of interference,

including commission of the following discriminatory housing practices in violation of 42 U.S.C. § 3617:

    a.    Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the rental of a dwelling because of disability, 24 C.F.R. § 100.400(c)(1); and,

    b.    Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the disability of such persons, 24 C.F.R. § 100.400(c)(2).

47. Each of these violations of § 3617 injured plaintiffs; accordingly, each is an aggrieved person entitled to relief under the Fair Housing Act, 42 U.S.C. § 3613(c).

**F.    Sixth Claim:  Invasion of Privacy**

48. Plaintiff Brenda Strout realleges and incorporates by reference all preceding paragraphs alleged herein.

49. Defendants, acting through their agents, injured Strout pursuant to a policy or practice that compelled disclosure of her personal, privacy, medical information.

50. Defendants' invasion of Strout's privacy injured Strout, which entitles her to damages.

//

//

### G. Seventh Claim: Breach of Quiet Enjoyment of Dwelling

51. Plaintiff Brenda Strout realleges and incorporates by reference all preceding paragraphs alleged herein.

52. Defendants, acting through their agents, injured Strout by breaching her private right of occupancy of her dwelling, including her personal enjoyment of her dwelling.

53. Defendants' infringement on Strout's private right of occupancy and quiet enjoyment of her dwelling injured Strout, entitling her to damages.

### H. Eighth Claim: Negligence

54. Plaintiff Brenda Strout realleges and incorporates by reference all preceding paragraphs alleged herein.

55. Defendants, acting through their agents, injured Strout by breaching their duty of care in the operation of their dwellings or supervision of their employees and agents.

56. Defendants' breach of their duty of care was a proximate cause of injury to Strout, entitling her to damages.

## VI. PRAYER

Wherefore, plaintiffs prays for entry of a judgment that:

1. Awards compensatory damages to Brenda Strout;

2. Awards punitive damages to Brenda Strout under her federal claims only;

3. Awards temporary, preliminary and final injunctive relief to the Fair Housing Center, requiring an end to defendants' discriminatory housing practices and requiring defendants to take affirmative steps to counteract and cure their unlawful and discriminatory practices;

4. Declares under 28 U.S.C. § 2201 that the defendants have violated the applicable federal and related state laws;

5. Awards reasonable attorneys' fees and costs; and

6. Awards any other relief deemed just by the Court.

Dated: October 23, 2020.

Respectfully submitted,

| | |
|---|---|
| INDIANA DISABILITY RIGHTS<br> Thomas E. Crishon (IN 28513-49)<br> tcrishon@IndianaDisabilityRights.org<br>4701 North Keystone Avenue, Suite 222<br>Indianapolis, Indiana 46205<br>Tel: (317) 722-555<br>Fax: (317) 722-5564 | BRANCART & BRANCART<br><br>*/s/ Christopher Brancart*<br>Christopher Brancart (CA 128475)<br>cbrancart@brancart.com<br>Post Office Box 686<br>Pescadero, CA 94060<br>Tel: (650) 879-0141<br>Fax: (650) 879-1103 |

Attorneys for Plaintiffs